## THE ADDIE B.[1]

### THE J. J. DRISCOLL.

### ABRAMS v. THE J. J. DRISCOLL.

*(District Court, E. D. New York. July 16, 1890.)*

SALVAGE—NEGLIGENCE.

A yacht was lying at anchor, when a gale arose, and the yacht became in danger of going ashore. To render her a salvage service, a tug took hold of the yacht to tow her off shore. The anchor of the yacht remained down, which fact was known to the master of the tug, but no effort was made to have the line taken in, the anchor being allowed to drag, until it caught in the anchor of libelant's yacht, which was thereby torn from her moorings, and subsequently went ashore. *Held*, that it was the fault of the tug.

In Admiralty.

Suit for damages caused by stranding.

*A. Van De Water*, for libelant.

*Hyland & Zabriskie*, for claimant.

BENEDICT, J. This action was commenced by Henry B. Abrams, then the owner of a small vessel called the "Addie B.," to recover of the steam-tug J. J. Driscoll for damages done to the Addie B. by stranding, under the circumstances hereafter stated. Abrams having died subsequent to the commencement of this action, it is now prosecuted by his daughter as executrix.

In September, 1889, at 10 A. M., the Addie B. was lying off Whitestone, made fast to a mooring-stone, when a dangerous wind blew up from the north-east. Her owner, to make her secure, put out two more lines to anchors, and then left her, thus safely moored in a proper place. The yacht Amaranth lay near the Addie B., and, being in danger of being driven on shore, the tug J. J. Driscoll, for the purpose of rendering a salvage service to the Amaranth, went to her assistance, took hold of her by a line from her bow, and commenced to tow her off the shore. At the time the Driscoll began to tow the Amaranth the Amaranth had an anchor down, and this the captain of the Driscoll knew, as he himself says. This anchor was being allowed to drag when the Amaranth passed the Addie B. in tow of the Driscoll. The dragging anchor of the Amaranth caught the anchor of the Addie B., and in this way the Addie B. was torn from her mooring, and she was towed by the tug for some distance by her anchor lines, when, the anchor lines parting, the Addie B., being thus freed from the Driscoll, brought up on her line, that was still fast to the mooring-stone. The storm was heavy, and, the mooring-stone proving insufficient to hold the Addie B., she was driven ashore, sustaining the injuries for which this action is brought.

The first point made in defense of the tug is that it was no negligence of hers that the Amaranth's anchor was down, and so caught the Addie

[1]Reported by Edward G. Benedict, Esq., of the New York bar.

B., but negligence of the Amaranth; and that the action should have been brought against the Amaranth instead of against the tug. The case of *The Jack Jewett*, 23 Fed. Rep. 927, is cited as authority for this position. But the present case differs from *The Jack Jewett* in that the J. J. Driscoll was engaged in performing a salvage service to the Amaranth. She had no contract with the Amaranth, but took charge of her in the capacity of salvor, for the sake of the salvage reward to which she would be entitled. She is accordingly responsible for any damage done by the Amaranth while so in her charge. It was in her power to get up the Amaranth's anchor. She knew it was down, and, having undertaken to tow her with the anchor down, is responsible for the damage that ensued.

The next position taken is that there was no fault in the navigation of the J. J. Driscoll, because she was ignorant of the position of the anchors of the Addie B., and, under the circumstances, was unable to pass further from the Addie B. than she did. The evidence shows that the anchors of the Addie B. were not out any unusual distance. The position of the Addie B. was notice to the tug that she had anchors out. It was her duty to avoid the anchors of the Addie B. Upon the evidence she could have taken the Amaranth further away from the Addie B., and so have avoided all danger of fouling.

The third and principal defense is that the Addie B. remained where she brought up after being dropped by the Driscoll for a space of three hours, during which time the Driscoll, according to some witnesses, on three, and, according to others, on four, occasions offered to her owner, Abrams, then on board of her, to take her to a place of safety, which offers were declined. The making of these offers is denied by the libelant. Abrams is dead, and three or four witnesses are called at the trial to prove this defense. These witnesses swear positively to the making of these offers, but in my opinion their testimony, positive as it is, must be held to be overthrown by the testimony of the witness Webster, called by the libelant. This witness, who has no interest whatever in the controversy, was asked by Abrams, of the Addie B., after she had been dragged from her mooring by the Driscoll, to take him out to her, and he did so. He was then requested to take a line from the Addie B. to another vessel near by, and he left the Addie B. for this purpose in his boat, but the vessel refused to take the line, and then Webster was blown off by the storm, and unable to regain the Addie B. Thus Abrams was left on the Addie B. alone, without a boat, in a dangerous storm. He was an old man, in poor health, and of feeble voice. That, under such circumstances, the old man should have refused any offers of the tug to put him in safety seems to me to be highly improbable. The facts proved show conclusively that he knew his vessel was in danger of dragging ashore, and no reason can be assigned why he should refuse to accept from the Driscoll an offer to repair the injury that had been done him by tearing his vessel from her moorings. In the next place it is difficult to believe that this feeble old man could have made himself heard on board the tug in such a storm as the witnesses say he did when

he refused their offers. Furthermore, the offers of assistance are said to have been made to the old man at intervals of about an hour and a half, and to have continued up to about 3 o'clock in the afternoon, when she went ashore. But Webster's evidence shows plainly that the Addie B. did not hold on for any considerable time after she was dropped from the tug, but went ashore in a short time. This witness watched her after he had been driven away from her, and says that he saw no approach to her by the Driscoll, as the witnesses from the Driscoll describe, and his evidence proves to my satisfaction that the Addie B. went ashore a considerable time before 3 o'clock. The witness saw the Addie B. go ashore, and himself rendered assistance to the old man at the time she came ashore, and before he went to his dinner. After that he went to his dinner, and at about 1 o'clock. The testimony of this witness is therefore entirely inconsistent with the testimony from the tug that on three or four occasions, extending up to 3 o'clock, they offered assistance to the old man. In this state of the evidence I am not convinced that proffers were made to Abrams to remove him to a place of safety. Furthermore, such offers, if made, in order to constitute a defense must appear to have been offers to take the Addie B. from the place of danger where she was left by the tug free of charge. There is no evidence to show that offers of that character were made. The offers, described by the witnesses for the tug, were simply to tow the Addie B. to a place of safety, presumably for salvage compensation, as in the cases of the other vessels which the tug did take out that morning. An offer by the tug to become a salvor to the Addie B. after she had been placed in a position of danger by the tug constitutes no defense to this action. But, as has been already said, the evidence has failed to satisfy me that any offers of any kind were made to the Addie B. by the tug.

Let a decree be entered in favor of the libelant, with an order of reference.